## Commonwealth *v.* Howell, Appellant.

Argued April 18, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN and PATTERSON, JJ.

*Frank L. Shallow,* with him *Ralph A. Dungan,* for appellant.

*Vincent A. Carroll,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

Opinion by Mr. Justice Linn, May 13, 1940:

Appellant, indicted for murder, pleaded not guilty. Counsel was appointed to defend him. When the case came on for trial, January 23, 1940, he withdrew his plea and pleaded guilty. Testimony was subsequently taken before a court of three judges.

Appellant was nearly 22 years of age. He had been a "backward" pupil in school and was transferred to a special school in which he reached the third grade and learned woodworking, carpentering and drawing, leaving school at the age of 16. He had suffered some injury in an automobile accident when he was 12 and appears to have had various illnesses. He had never had any gainful employment. He built a pushcart which he used to transport coal to his home and to persons to whom he sold it, from points along railroads where he had stolen it. In April, 1939, he was arrested for stealing coal and, on a plea of guilty, was sentenced to the county prison where he remained until July, 1939, when he was paroled; 2½ years of his term were unserved. December 7, 1939, at about 8:30 p. m., he was arrested in Fairmount Park, Philadelphia, by an officer who found him in possession of bags of coal, stolen from cars on the railroad near by. The officer, Westdahl, took him to Park Guard headquarters and delivered him to the house sergeant at about 9:30 p. m. He was assigned to a seat in the room. While there, Park Guard Bainger entered and, at the house sergeant's request, searched appellant. Bainger then stood at a desk, writing, with his back toward appellant. Bainger carried a gun suspended from a swivel holster visible to appellant. He seized Bainger's gun and shouted "Get over there." Bainger rushed at Howell who dropped the gun; in the struggle for possession Howell got the gun and shot Bainger; a buckle apparently deflected the bullet, which might otherwise have been fatal. Officer Westdahl and Howell then began shooting at each other. Howell shot Westdahl in the abdomen from the ef-

fect of which he died four days later. Howell was shot in the right hand and in the face by Westdahl.

A psychiatrist, connected with the Municipal Court, examined appellant and testified to the result of his examination, which concluded: "Howell is high grade feeble minded, he is dull and apathetic, with little judgment or reasoning ability. He acts impulsively, he is extremely dangerous when he is frightened or confused. He is not socially responsible, but he does know the difference between right and wrong, he knows it is wrong to steal, he ran when he saw the detective because he had been stealing. He knows it is wrong to kill, but when pressed to answer when asked what he expected to happen to him he said, 'Either life or death.' " Howell had also been subjected to a psychometric test. (Revised Stanford-Binet Intelligence Scale) by a psychologist of the Municipal Court who reported that he had a mental age of 7 years and 3 months and an Intelligence Quotient of 48.

We have read the record and, as required by the statute, are satisfied that the elements necessary to constitute murder of the first degree appear. The Act of May 14, 1925, P. L. 759, 18 PS section 2222, provides that "In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life." The learned court below concluded that Howell was guilty of murder of the first degree and imposed the death penalty. His counsel presents the following Statement of Question Involved: "Should a death sentence be imposed as an alternative to life imprisonment on a plea of guilty of murder which the Court has fixed at first degree where the evidence shows that the defendant, being able to distinguish between right and wrong, and, therefore, legally sane, was suffering from a mental condition scientifically known as high-grade feeble-mindedness, with consequent diminution of responsibility for his acts?"

The appeal was admirably presented by counsel who made the oral argument. The point now for consideration is not whether this Court would have imposed the death penalty but whether the discretion vested in the court below "was judicially exercised, whether the record shows a case in the class justifying sentence of death, or in a class justifying the lower sentence of life imprisonment." *Com. v. Garramone,* 307 Pa. 507, 513, 161 A. 733. Was there abuse of judicial discretion confided by the statute to the court below?

Howell was legally sane. After referring to *Com. v. Talarico,* 317 Pa. 481, 177 A. 1; *Com. v. Williams,* 307 Pa. 134, 160 A. 602; *Com. v. Stabinsky,* 313 Pa. 231, 169 A. 439, and *Com. v. Hawk,* 328 Pa. 417, 196 A. 5, the court, in its opinion filed pursuant to Rule 58, said: "And how should a just conclusion be reached? The defendant knew the consequences of his act. He knew the difference between right and wrong and he knew that the punishment for his crime would be either life or death. Even though he be a high-grade feeble-minded person, dumb and apathetic, the court had an opportunity to observe his conduct, his emotions and his reactions. Even a layman can form an opinion of a person's mentality. During the taking of testimony he was anything but dull and apathetic, but rather alert and reacted by facial expression and in other ways to testimony that was harmful to him. He did not assume the indifferent attitude of the usual high-grade feeble-minded person, staring about and showing a decided lack of interest in what concerned him most. On the contrary, he toyed with his hat during the entire time he sat at counsel's table, listening intently to the testimony, and continued to handle his hat on the witness stand. There is nothing unusual about this, as it is typical of witnesses in all sorts of cases. He answered the questions addressed to him by the trial judges and had no difficulty in explaining what prompted him to commit the act for which he was on trial. He answered

his counsel's questions with much less hesitation than those of the assistant district attorney. Possessing a bad temper is no justification for crime, and the fact that his ire is easily stirred up could not be adopted as a reason for mitigating the penalty.

"Every factor that might prove mental weakness was considered with care, and after a thorough examination of the entire record, giving full and fair consideration to all the evidence, reconciling contradictions where they were found, the court is of the unanimous opinion that there was no evidence of such mental weakness manifested by the defendant either before, at the time or after the commission of his crime, to justify life imprisonment in preference to the death penalty."

In our review of the record, in the light of the arguments presented, we have all reached the conclusion that this Court should hold that there was no abuse of discretion in imposing the death penalty.

Judgment is affirmed and record remitted to the end that sentence may be executed.